Charles S. Price (006197)
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
Phone: (602) 285-5000
Fax: (602) 285-5100
cprice@dickinsonwright.com
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Xcentric Ventures, LLC, d/b/a Ripoff Report.com, <br><br>　　　　　Plaintiff, <br><br>　　v. <br><br>Joshua Polloso, Epifaniou and Pierre Zarokian, <br><br>　　　　　Defendants. | Case No. <br><br>**COMPLAINT** <br><br>**(Computer Fraud and Abuse Act; Copyright Infringement; Aiding & Abetting Tortious Conduct)** |

Xcentric Ventures, LLC, for its Complaint herein, alleges as follows:

**PARTIES**

1.　Plaintiff Xcentric Ventures, LLC ("Xcentric") d/b/a RipoffReport.com ("Ripoff Report") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.

2.　Defendant Joshua Polloso Epifaniou ("Epifaniou") is, upon information and belief, a resident of Nicosia, Cyprus.

3.　Defendant Pierre Zarokian ("Zarokian") is, upon information and belief, a resident of Glendale, California.

1

4. Defendant Jane Doe Zarokian is, upon information and belief, the spouse of Zarokian; at all times pertinent hereto, Zarokian was acting on behalf of the marital community.

5. Epifaniou and Zarokian are collectively referred to as the "Defendants."

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 1338. This case primarily involves federal questions, specifically violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and copyright infringement in violation of 17 U.S.C. § 501.

7. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367 in that the state law claims are integrally interrelated with the federal claims and arise from a common nucleus of operative facts, such that the administration of the state law claims with the federal claims furthers the interest of judicial economy.

8. This Court has personal jurisdiction over each of the Defendants because Ripoff Report's cause of action against each of them arises out of or results from each Defendant's forum-related contacts as recounted below, and the exercise of personal jurisdiction is fair and reasonable in light of those contacts.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this Court has personal jurisdiction over the Defendants.

10. Venue is further proper in this Court because each of the defendants committed an intentional tortious act, which was expressly aimed at this state, and which caused harm which was suffered and which the defendant knew was likely to be suffered within the jurisdiction. The Defendants' conduct as described herein gave rise to this suit, and the exercise of jurisdiction is reasonable in the circumstances.

**FACTUAL ALLEGATIONS**

**Background & History of RipoffReport.com**

11. RipoffReport.com was founded in Arizona in 1998 by non-party Ed Magedson ("Magedson").

12. Since August 2003, Ripoff Report has been owned and operated by Xcentric, with Magedson serving as Xcentric's Manager and Ripoff Report's Editor-in-Chief.

13. Ripoff Report is an online forum for free speech. The site allows consumers to post complaints about companies and individuals who they feel have wronged them in some manner.

14. The Ripoff Report is 100% free to use—it charges nothing whatsoever to users who create reports, nothing to viewers who read reports, and nothing to anyone wishing to respond to reports.

15. For the past 20 years, Ripoff Report's primary mission has been to help educate consumers so they can make better and more informed decisions before spending their hard-earned money. Ripoff Report accomplishes that mission by allowing members of the public to share information and experiences about bad business practices, scams, and frauds, among other things.

16. By collecting and maintaining a large, searchable, and permanent database of consumer complaints, Ripoff Report allows consumers to research the track record of a business to see what other people have said about them.

17. In addition to helping consumers, Ripoff Report works closely with all levels of federal, state, and local law enforcement, including, but not limited to, various state attorneys general, county attorneys, Homeland Security, the United States Justice Department, United States Secret Service, FBI, FTC, SEC, US Postal inspectors, and local police, providing them with information used to locate victims, detect patterns of

3

1  deceptive business practices and prosecute violations of consumer protection laws, among other things.

**Ripoff Report's Valuable Content Database**

18. Since 1998, Ripoff Report has spent millions of dollars building and maintaining one of the largest and most valuable online databases of consumer complaints, reviews, and comments. Although this database is primarily comprised of third-party submitted information, Xcentric's internal staff make certain creative contributions to the database which has substantially increased its value.

19. Among other things, prior to publication, all content submitted to the Ripoff Report website is reviewed and screened by a team of paid content monitors employed by Xcentric.

20. Xcentric's content monitors follow a written set of policies which require them to remove/redact certain types of illegal, offensive, or sensitive content including:

    i.    Social Security Numbers
    ii.   Credit Card Numbers
    iii.  Bank Account Numbers
    iv.   Private Personal Information (i.e., login/password information for any accounts)
    v.    Home Addresses of Individuals
    vi.   Images of Child/Obscene Pornography
    vii.  Actual/Implied Threats Of Serious Injury or Violence
    viii. Obvious Instances of Copyright Infringement
    ix.   Obvious Instances of Any Unlawful Conduct

21. Xcentric's content monitors also have discretion to block/reject any content that is deemed "low-value" such as obvious commercial advertising, reports that lack sufficient factual details to be useful to others, excessive profanity and so forth.

22. Over the years, Ripoff Report has built a database of high-quality information that has significant value.

23. To protect that value, Xcentric owns several registered copyrights which apply to content appearing on the Ripoff Report site including Reg. # TXu 1-574-438 (effective registration date: March 25, 2008); Reg. # TXu 1-574-438 (effective registration date: May 20, 2008); and TX 7-491-670 (effective registration date March 7, 2012).

24. Recently, several of Xcentric's competitors have engaged in the widespread and systematic theft of content from Ripoff Report in an attempt to "seed" their competing websites with high-quality content. For instance, in 2008 Xcentric filed suit against a competing website – www.ComplaintsBoard.com – in the United States District Court for the District of Arizona, Case No. 08-cv-2299-HRH, entitled *Xcentric Ventures, LLC v. Elizabeth Arden a/k/a Sergey Krudrjavcev*. In that suit, Xcentric alleged that ComplaintsBoard.com infringed Xcentric's registered copyrights by stealing thousands of pages of material from the Ripoff Report.

25. Similarly, in 2008 Xcentric filed suit against another competing website – www.PissedConsumer.com – in a case entitled *Xcentric Ventures, LLC v. Opinion Corp.*, Case No. 08-cv-1841-JAT. Once again, Xcentric alleged the owner of a competing website stole tens of thousands of pages of content from the Ripoff Report, in violation of Xcentric's registered copyrights.

26. Yet again, in 2011 Xcentric filed suit against another competing website – www.ScamInformer.com – in a case entitled Xcentric *Ventures, LLC v. Karsen, Ltd.*, Case No. 11-cv-1055-FJM. As with the other cases, Xcentric alleged the owner of a competing website stole tens of thousands of pages of content from the Ripoff Report, in violation of Xcentric's registered copyrights.

27. Each of the above-mentioned infringement suits was resolved in favor of Xcentric, either by settlement or by final judgment.

28. The repeated theft of large amounts of copyright-protected content owned by Xcentric, and Xcentric's efforts to redress such theft, reflect the extremely valuable nature of such content.

**Ripoff Report's Non-Removal Policy & CDA Immunity**

29. In addition to spending millions of dollars building a valuable database of content, Xcentric has also spent millions more defending the rights of its users to exercise their free speech rights on the Ripoff Report website. As part of those efforts, Xcentric has adopted a general policy of not removing content from its website, even when the facts are contested and even if the underlying dispute has been resolved.

30. One of the primary purposes of Xcentric's non-removal policy is to create a permanent record of all complaints, including both complaints that are valid, and those that have been refuted. Because a Ripoff Report maintains a permanent record of all complaints, users of the site are better able to view and detect patterns of conduct over time.

31. A second reason for Xcentric's non-removal policy is to make it difficult or impossible for a company with significant financial resources to use a threat of litigation to force an individual author with limited resources to remove truthful statements simply to avoid an expensive lawsuit. Because users are unable to remove their own submissions, this type of threat is generally ineffective in the context of the Ripoff Report.

32. Because Xcentric refuses to remove content upon demand, it has been sued more than 100 times by companies and individuals seeking to have complaints removed from the Ripoff Report. In virtually every one of these cases, in addition to money damages, the plaintiff also requested injunctive/equitable relief requiring Xcentric to remove the disputed content.

33. In general, a majority of courts have agreed that under a federal law called the Communications Decency Act, 47 U.S.C. § 230(c)(1) (the "CDA"), website operators like Xcentric cannot be held liable for publishing information that originated with a third party. *See*, *e.g.*, *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F.Supp.2d 929 (D.Ariz. 2008).

34. Based on the protection provided by the CDA, except for certain issues relating to intellectual property (i.e., copyrights/trademarks) and certain sex trafficking laws, Xcentric is generally not required to remove content from its website. This is true even when someone claiming to be the original author asks Xcentric to remove a report, and even when a person/company claims that something in a report is factually untrue.

35. Xcentric's non-removal policy is somewhat controversial, but not at all unique. On the contrary, many major website operators such as eBay, Google, Facebook, TripAdvisor, Twitter, Yahoo!, Yelp, and others have similar policies.

36. For example, in July 2018, the California Supreme Court ruled that under the CDA, popular business review website Yelp.com could not be forced (even by court order) to remove derogatory reviews, even after a court determined that a review contained false and defamatory statements. *See Hassell v. Bird*, 5 Cal.5th 522 (Cal. 2018).

37. Like Yelp, Xcentric has frequently defended lawsuits seeking to force the removal of user-submitted content.

38. For example, in 2007, the United States District Court for the District of Arizona ruled that Xcentric was not required to comply with a removal order issued by a Canadian court. *See Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 2007 WL 2949002 (D.Ariz. 2007).

39. In 2010, the United States Court of Appeals for the Seventh Circuit affirmed a district court's order finding that Xcentric could not be ordered to remove

7

1  user-submitted content in a case in which it was not a party. *See Blockowicz v.*
2  *Williams*, 630 F.3d 563 (7th Cir. 2010).

3      40. Later, in 2011, a Florida court held that even when Xcentric is a party to a proceeding, an order requiring Xcentric to remove user-submitted content was barred by the CDA. *See Giordano v. Romeo*, 76 So.3d 1100 (Fla. 3d Dist. 2011).

6      41. Website operators like Yelp and Xcentric carefully scrutinize court orders, because some such orders are forgeries.

8      42. In addition, such orders can easily be obtained by fraud, either on the part of the litigants or their lawyers.

10     43. Unfortunately, even when a court order has been obtained fraudulently, and even when the true facts have been exposed and brought to the court's attention, some judges have refused to vacate their removal orders. *See, e.g.*, Tim Cushing, *Judge Refuses To Fix His Rubber-Stamping Of A Fraudulently-Requested Court Order* (available at: https://www.techdirt.com/articles/20170513/11491537357/judge-refuses-to-fix-his-rubber-stamping-fraudulently-requested-court-order.shtml)

16     44. To balance the relevant concerns in a reasonable way, Xcentric has adopted a policy of removing/redacting content under appropriate circumstances; such circumstances may include removing/redacting information where a legitimate court order determines that the information is factually false. Xcentric also has policies of removing/redacting content in other circumstances such as cases of harassment/bullying.

22     **SEO Companies Offer Costly Ripoff Report "Suppression" Services**

23     45. Xcentric's non-removal policy has given rise to a new industry of "SEO" or "search engine optimization" companies targeted at Ripoff Report.

25     46. In short, SEO companies offer to help people "optimize" their search engine results. In this context, "optimize" means removing or hiding bad information

and/or emphasizing good information. SEO companies promise to provide these benefits in exchange for payment of substantial fees.

47. In the past, many SEO companies advertised that they could help customers "remove" content from Ripoff Report. All such promises were completely false.

48. What most SEO companies advertising these services would do, rather than removal, was to attempt to "suppress" Ripoff Report links that appeared on the first several pages of Google search results, usually by creating large amounts of new, favorable content regarding the customer and thus causing the Ripoff Report results to drop lower. Such efforts tended to be expensive, and less satisfactory to many customers than outright removal would have been.

**Zarokian Advertises SEO Service To Remove Content From Ripoff Report**

49. Defendant Zarokian is the founder and CEO of non-party Submit Express, Inc. ("Submit Express") which offers SEO services via its website www.SubmitExpress.com.

50. Prior to mid-2016, Zarokian offered a "Ripoff Report Removal Service" which is explained at the following link: https://www.submitexpress.com/ripoff-report-removal-service/.

51. Prior to mid-2016, like other companies providing SEO services, Zarokian's primary method of dealing with Ripoff Report posts was not to actually remove content from Ripoff Report. Instead, the primary method used by Zarokian was "SEO Push Down (aka Suppression)" which is described on Submit Express's website as follows:

> **2. SEO Push Down (aka Suppression)**
>
> The primary way to do this is to setup several company- or brand-related social profiles, websites and/or blogs and make them rank for the keyword you are trying to target. The strategy may involve creating hundreds of social media profiles and even some videos. Top social media sites such as Facebook, Twitter and Youtube often rank high for a company name due to their prominence. However, additional link building may be necessary to give these positive pages a higher ranking than Ripoffreport.com. A lot of content writing and article writing will be necessary as well.
>
> Although in theory this task sounds easy, in reality it is a lot of work. Ripoff Report Removal is not easy. Our service will include social profile creation on the top 300 social media sites. In addition, we provide content writing services for the newly created websites and blogs. Also, Link building has to be done for a minimum of 10-20 websites, blogs, and social profiles in order to rank those pages higher than a Rip Off Report.

52. The Ripoff Report-related SEO Push Down services offered by Zarokian were not a perfect solution for many reasons. Among other things, customers paying for this service were told that the original content would remain on Ripoff Report's website and would only be "suppressed" from Google's and Bing's search results pages. Accordingly, even when successfully performed, the SEO Push Down services offered by Zarokian would not stop anyone from reading the customer's original post(s) which remained visible on Ripoff Report's website.

53. Furthermore, Zarokian's Ripoff Report-related SEO Push Down services were generally not guaranteed to work for any specific length of time, and the amount of work required to successfully suppress Ripoff Report links was significant.

54. For each of these reasons among others, on information and belief Zarokian's Ripoff Report-related SEO Push Down services were difficult to sell and resulted in only limited financial success.

55. Based on his experience working in the SEO industry, Zarokian knew that if it were possible to completely remove content from the Ripoff Report, customers would be willing to pay large sums of money for such a service, and it would be easy to sell.

**Epifaniou Illegally Hacks Into Ripoff Report**

56. Attached hereto as **Exhibit A** is a Search and Seizure Warrant issued by

10

1    the United States District Court for the Central District of California in Case No. 2:17-
2    mj-0220-DUTY (the "Search Warrant"), the contents of which are incorporated by
3    reference.

4        57.    The Search Warrant is supported by an affidavit executed by FBI Special
5    Agent Erin F. Gibbs ("Agent Gibbs"), the contents of which are incorporated by
6    reference.

7        58.    As explained in the Search Warrant and affidavit, on October 30, 2016,
8    Defendant Epifaniou attempted to "hack" into Ripoff Report's server using a "brute
9    force" attack (i.e. systematically trying different passwords until one works).

10       59.    As a result of the brute force attack, Epifaniou successfully gained access
11   to Ripoff Report's server on or about October 30, 2016 at 1:39 PM.

12       60.    After gaining access to Ripoff Report's server, Epifaniou or someone
13   working with him created three new user accounts within Ripoff Report's system.

14       61.    Epifaniou or someone working with him gave each new account
15   "moderator" status which allowed that account to make changes to, or to delete, content
16   on Ripoff Report.

17       62.    Over the period of the next several weeks, Epifaniou or someone working
18   with him made approximately 7,760 changes to data appearing on Ripoff Report.

19       63.    After gaining access to Ripoff Report's server, Epifaniou downloaded a
20   complete copy of all data on the server, including Ripoff Ripoff's entire database of
21   copyrighted information.

22       64.    On May 17, 2017, Epifaniou was arrested in Nicosia, Cyprus by Cypriot
23   law enforcement and his computers, cell phones, and other electronic devices were
24   seized.

25       65.    On June 8, 2017, Epifaniou was interviewed by FBI agents in Cyprus.
26   During that interview, Epifaniou admitted that he hacked into Ripoff Report's server,

created new user accounts, and used those accounts to make changes to Ripoff Report's database of content.

66. Epifaniou further admitted attempting to extort $90,000 from Ripoff Report in exchange for not leaking confidential author information from Ripoff Report's database.

67. Upon searching Epifaniou's computer and electronic devices, FBI agents discovered chat messages such as the one shown below between Epifaniou and Zarokian in which they discussed selling Ripoff Report removal services in exchange for a fee by falsely telling customers that the removal was accomplished by lawful means rather than by computer hacking:

> 16. For example, on or about November 9, 2016, Epifaniou and Zarokian discussed removing data from the ROR website for a fee but pretending that it was accomplished through court orders rather than computer hacking:[2]
>
> (5:52:12 AM) [Zarokian]: hi
> (5:52:19 AM) [Epifaniou]: all the data is ready
> (5:52:27 AM) [Epifaniou]: what do you want to ask?
> (5:52:27 AM) [Zarokian]: so I have a guy with 9 posts
> (5:52:31 AM) [Epifaniou]: yes
> (5:52:34 AM) [Epifaniou]: what about it then?
> (5:52:56 AM) [Zarokian]: i told him it will take 1.5 months to 2 months, because we have to do in 3 batches and we do one every 2 weeks
> (5:53:18 AM) [Zarokian]: i wanted it to sound realistic with court order removals
> (5:53:32 AM) [Epifaniou]: yea sure
> (5:53:35 AM) [Zarokian]: the issue is, he does not want to pay unless all are removed
> (5:53:35 AM) [Epifaniou]: i get it
> (5:53:38 AM) [Epifaniou]: lol
> (5:53:41 AM) [Epifaniou]: nope.
> (5:53:43 AM) [Epifaniou]: ignore him.
> (5:53:45 AM) [Epifaniou]: timewaster
> (5:53:49 AM) [Epifaniou]: move on
> (5:54:10 AM) [Zarokian]: but 9 is a lot...you make $9K

68.     Over the next several months, between November 2016 and May 2017, Zarokian and Epifaniou agreed to advertise and sell Ripoff Report removal services in exchange for fees to be paid to Submit Express of between $3,000 to $5,000 per removed report. Of this amount, Zarokian agreed to pay $1,000 per report to Epifaniou.

69.     Between November 2016 and May 2017, Zarokian sold Ripoff Report removal services to numerous individuals. In each instance, Zarokian would accept payment from the customer based on the number of reports to be removed and would then forward payment to Epifaniou along with a list of the reports to be removed. In turn, Epifaniou would then log into Ripoff Report's server and remove the reports in question.

70.     Upon information and belief, between November 2016 and May 2017, Epifaniou removed more than 100 reports in response to paid requests from Zarokian.

71.     Zarokian knew that Epifaniou had obtained access to Ripoff Report's server via unlawful means.

72.     Zarokian further knew that Epifaniou could only remove content from Ripoff Report via unlawful means.

73.     Both Zarokian and Epifaniou knew that Xcentric did not authorize either of them to access Ripoff Report's server at any time or to remove any content from Ripoff Report at any time.

74.     On September 27, 2017, after substantial investigation, the United States of America indicted Epifaniou on numerous counts related to his hacking of Ripoff Report's website, including 18 U.S.C. § 1030(b) (Conspiracy to Commit Computer Hacking), 18 U.S.C. § 1030(a)(2), (c)(2)(B)(i) & (c)(2)(B)(iii) (Obtaining Information from Protected Computer), 18 U.S.C. § 1030(a)(5)(A) & (c)(4)(B) (Intentional Damage to Protected Computer), 18 U.S.C. § 1030(a)(7)(B) & (c)(3)(A) (Threatening Damage

to Protected Computer), and 18 U.S.C. §§ 982(a)(2)(B) & 1030(i) (Forfeiture Allegation).

75. The Epifaniou indictment, a copy of which is attached hereto as **Exhibit B** ("Indictment") includes the allegations set forth below which Ripoff Report believes and understands to be true and incorporates herein (the paragraph numbers below refer to paragraphs in the Indictment):

> 1. "Ripoff Report (ROR), a company based in Phoenix, Arizona, hosts a website where customers can post anonymous complaints about people and businesses. The subject of the complaint can then post a rebuttal. ROR does not remove complaint reports; instead, persons about whom complaints are posted are only permitted to post rebuttals."
>
> 2. "The company identified below as 'SEO Company' is a search engine marketing company based in Glendale, California. Its website claims that the company offers, among services, 'reputation management services, as well as Ripoff Report Removal Service, Yelp Negative Review Repair, TheDirty.com Post Removal, Scam.com Post Removal, ComplaintsBoard.com Post Removal and ScamBook.com Post Removal.'"
>
> 3. "On October 30, 2016, JOSHUA POLLOSO EPIFANIOU, a resident of Nicosia, Cyprus, obtained unauthorized access to ROR's database through a brute force attack. A brute force attack is a trial-and-error method used to obtain information, such as a user password or personal identification number (PIN). In this case EPIFANIOU used the attack to successfully override ROR's login and password protection to access its database through an existing account for an ROR employee."
>
> 4. "On November 18, 2016 EPIFANIOU emailed ROR's CEO using the email address charysqz@gmail.com threatening to publicly disseminate stolen ROR data unless the company paid him $90,000 USD within 48 hours. EPIFANIOU emailed again the following day with a hyperlink to a video recording demonstrating EPIFANIOU's unauthorized access to the ROR CEO's account."
>
> 5. "Between October 2016 and May 2017, EPIFANIOU worked with an associate at SEO Company to identify companies that might be interested in paying for removal of complaints posted on ROR's website, which EPIFANIOU would then illegally remove through unauthorized access to the ROR database. EPIFANIOU and his conspirator removed at

least 100 complaints from the ROR database, charging SEO Company's "clients" approximately $3,000 to $5,000 for removal of each complaint."

76. The "SEO Company" as referenced in the Epifaniou indictment, is Zarokian's company, Submit Express, Inc.

**FIRST CAUSE OF ACTION**
**Violation of Computer Fraud & Abuse Act; 18 U.S.C. § 1030**
**(Against Epifaniou & Zarokian)**

77. The factual allegations of each above paragraph are realleged and incorporated as if fully set forth herein.

78. Unauthorized access to certain protected computers is prohibited by the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA").

79. The computer server Xcentric uses to host the Ripoff Report website is a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2)(B) because the server is used in, or affects, interstate commerce and communication.

80. As alleged in the Indictment, between October 2016 and May 2017, Epifaniou violated the CFAA by:

    A. Intentionally obtaining access to, and repeatedly continuing to access, Xcentric's server without authority and thereby obtained information from the server including, but not limited to, Xcentric's database of content, in violation of 18 U.S.C. § 1030(a)(2)(A);

    B. Intentionally obtaining access to, and repeatedly continuing to access, Xcentric's server without authority and with intent to defraud, and by means of such conduct furthering the intended fraud and obtaining things of value thereby, in violation of 18 U.S.C. § 1030(a)(3);

    C. Intentionally accessing Xcentric's server without authority and knowingly transmitting a command to the server which resulted in

15

        damage to the server resulting in the deletion of data, in violation of 18 U.S.C. § 1030(a)(5)(A);

    D. Intentionally obtaining access to, and repeatedly continuing to access, Xcentric's server with the intent to extort money from Xcentric by threatening to release confidential information unlawfully obtained from Xcentric's server in violation of 18 U.S.C. § 1030(a)(7)(B).

81. As alleged in ¶¶ 9(A)–(M) of the Indictment, Zarokian conspired with Epifaniou to violate 18 U.S.C. § 1030(b).

82. The unlawful conduct of Epifaniou and Zarokian actually and proximately caused economic loss to Xcentric within the meaning of 18 U.S.C. § 1030(e)(11) in an amount greater than $5,000 which includes, but is not limited to, all reasonable costs incurred by Xcentric as a result of the events descried above such as:

    A. The costs of discovering and assessing the extent of damage caused by Defendants;

    B. The costs of repairing and restoring Xcentric's data, programs, systems, and/or information to their condition prior to the events described herein;

    C. Lost revenue;

    D. Other consequential damages incurred because of the unauthorized access to Xcentric's systems.

83. Based on the foregoing, Epifaniou and Zarokian are liable to Xcentric pursuant to 18 U.S.C. § 1030(g) in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**Copyright Infringement; 17 U.S.C. § 501**
**(Against Epifaniou)**

84. The factual allegations of each above paragraph are realleged and incorporated as if fully set forth herein.

85. Xcentric owns several registered copyrights which apply to content appearing on the Ripoff Report site including Reg. # TXu 1-574-438 (effective registration date: March 25, 2008); TX 7-500-460 (effective registration date February 2, 2012); TX 7-491-670 (effective registration date March 7, 2012); and Reg. # TXu 1-574-438 (effective registration date: May 20, 2008) (collectively, the "Copyrighted Works").

86. Between October 2016 and May 2017, Epifaniou willfully violated Xcentric's exclusive right to reproduce the Copyrighted Works by creating an unauthorized copy of Xcentric's database which included complete copies of the Copyright Works, in violation of 17 U.S.C. § 106(1).

87. As a result of Epifaniou's willful infringement, Xcentric is entitled to statutory damages in the amount of $150,000 per infringed work pursuant to 17 U.S.C. § 504(c), plus attorney's fees and costs pursuant to 17 U.S.C. § 505.

**THIRD CAUSE OF ACTION**
**Aiding and Abetting Tortious Conduct**
**(Against Zarokian)**

88. The factual allegations of each above paragraph are realleged and incorporated as if fully set forth herein.

89. As alleged above and in the Indictment, Epifaniou engaged in conduct for which he is liable to Xcentric; to wit, repeated willful violations of the Computer Fraud and Abuse Act.

17

90. Between October 2016 and May 2017, Zarokian was aware that Epifaniou had violated, and was planning to continue violating, the CFAA by repeatedly accessing Xcentric's server without authorization.

91. As alleged in ¶¶ 9(A)–(M) of the Indictment, Zarokian conspired with, and provided substantial assistance to, Epifaniou with the intent of promoting Epifaniou's unlawful actions.

92. As a result of Zarokian actively aiding and abetting the unlawful conduct of Epifaniou, Zarokian is liable to Xcentric for all damages actually and proximately caused by Epifaniou in an amount to be proven at trial, but which Xcentric alleges is in excess of $75,000.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Xcentric demands a jury trial on all issues so triable.

**WHEREFORE**, Plaintiff XCENTRIC VENTURES, LLC prays for judgment as follows:

    a.    For an award of any and all damage and loss caused by Defendants pursuant to 18 U.S.C. 1030(g) in an amount to be proven at trial;

    b.    For statutory damages in the amount of $150,000 per infringed work pursuant to 17 U.S.C. § 504(c) and attorney's fees pursuant to 17 U.S.C. § 505;

    c.    For such other and further relief as the Court finds proper.

**DATED** this 31th day of October, 2018.

**DICKINSON WRIGHT PLLC**

By: */s/ Charles S. Price*
    Charles S. Price
    1850 North Central Avenue, Suite 1400
    Phoenix, AZ 85004
    ***Attorneys for Plaintiff***

PHOENIX 64225-16 498310v3